NUMBER 13-10-00231-CV

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

                                  CORPUS CHRISTI -
EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



TEXAS DEPARTMENT OF TRANSPORTATION,                    Appellant,

 

v.

 

JOSE LUIS PERCHES, SR. AND ALMA DELIA

PERCHES, INDIVIDUALY AND ON BEHALF OF 

THE ESTATE OF JOSE LUIS PERCHES, JR.,                         Appellees.

 

 



On appeal from the 92nd District
Court

of Hidalgo County, Texas.

 

 



     O P I N I O N

 

Before Chief Justice Valdez and
Justices Rodriguez and Vela

 Opinion by Chief Justice Valdez

 

            In this accelerated,
interlocutory appeal, appellant, the Texas Department of Transportation
(“TxDOT”), challenges the trial court’s denial of a plea to the jurisdiction in
favor of appellees, Jose Luis Perches Sr. and Alma Delia Perches, individually
and on behalf of the estate of Jose Luis Perches Jr., deceased (“Perches”), in
a premises-liability case brought under the Texas Tort Claims Act (“TTCA”).  See
Tex. Civ. Prac. & Rem. Code Ann.
§§ 101.001-.109 (Vernon 2005 & Supp. 2010).  By two issues, TxDOT argues
that the trial court:  (1) erred in denying the plea to the jurisdiction
because the Percheses’ claims fall within TxDOT’s design-discretion immunity;
and (2) lacked subject-matter jurisdiction to issue a permanent injunction to
close a state highway.  We affirm.

I.             
Background

 

A.  
The Bicentennial Underpass

 

The dispute in this case
centers on the safety of the Bicentennial underpass located at U.S. Highway 83
and Bicentennial Street in McAllen, Texas.  At approximately 3:45 a.m. on
November 6, 2008, twenty-four-year-old Jose Jr. was killed when he crashed into
a concrete barrier while attempting to make a left turn on the Bicentennial
underpass, careened over the edge, and fell more than twenty feet to the
roadway beneath.                     

The Bicentennial underpass
consists of a ramp allowing access from the westbound lanes of U.S. Highway 83
to a bridge that traverses over the highway.[1] 
At the end of the ramp is a “T-intersection,” which only allows westbound drivers
exiting U.S. Highway 83 to turn left onto Bicentennial Street.[2]  The underpass opened
on November 30, 1999, and TxDOT intended for the underpass to reduce congestion
for those driving to the La Plaza Mall and the McAllen-Miller International
Airport.  Since its inception, several serious accidents have occurred on the
underpass.[3]
  

B.  
Jesus S. Leal’s Deposition

 

Leal testified that, as
Director of Transportation and Operations for TxDOT, he oversees, among other
things, “all the traffic operations that consist of designing of signing,
striping, traffic signals . . . .”  Leal acknowledged that he participated in
planning and implementing signage, striping, and traffic signals on the
Bicentennial underpass.  He recalled four automobile accidents that had
transpired on the underpass and the remedial actions taken by TxDOT in response
to the accidents.  Leal remembered that the first accident occurred on an
unknown date and involved an unidentified female.  Apparently, the female was
killed while driving on the underpass.  The second accident occurred on January
1, 2005, and resulted in the death of the daughter of former Mission Chief of
Police Leo Longoria.  The third accident involved an unidentified male.  And
finally, the fourth accident involved Perches.  

Leal testified that,
after each accident on the underpass, TxDOT engaged in an investigation to
determine what improvements could be made to the roadway to reduce the number
of accidents.  After the first accident, TxDOT added “supplemental signing and
striping,” including “some additional arrows on the pavement, the left-turn
arrows up on the ramp on the approach” to warn drivers that they must turn left
as they approached the “T-intersection.”[4] 
After the second accident, TxDOT installed rumble strips—“little thermoplastic
bars, probably about 18 inches in length and pretty good thickness at the
highpoint, probably 3-to 500 mill[imeter]s”—at the bottom of the ramp. TxDOT
also installed a “large warning sign with a 90-degree arrow turn and an
advisory of 20 miles per hour speed as far as how to take the turn on the ramp
up Bicentennial.”  The warning sign also had two flashers on top of the sign to
warn drivers.  In addition, TxDOT modified “the mast arm for the [traffic]
signal” at the intersection to include “green arrows to further accentuate the
fact that you need to go left.”  After the third accident, TxDOT further
modified the traffic signal to include an additional green arrow directing
drivers to turn left at the intersection, and it “added a second arrow
board . . . north of the existing one,” as an additional
warning to drivers that they could only turn left at the intersection.  The
record does not reflect that the signage used by TxDOT indicated that the road
ended at the “T-intersection.”  After Jose Luis Perches Jr.’s accident, TxDOT closed
the ramp and repaired structural damage that was done to one of the concrete barriers. 
Leal noted that all of the accidents occurred between 12:00 a.m. and 4:00 a.m.
and that TxDOT was considering closing the ramp and intersection during those
hours or implementing a modified “cantilever arm” similar to those used at
railroad crossings to prevent drivers from using the underpass during specified
times. 

Leal also testified that
after each accident, TxDOT consulted several engineering firms, including Brown
& Gay Engineers, Inc., HDR Engineering, Inc. (“HDR”), TEDSI Infrastructure
Group, Inc. f/k/a Traffic Engineering & Design Systems, Inc. (“TEDSI”), and
Dannenbaum Engineering Corp. (“Dannenbaum”), to obtain expert guidance about
how to make the underpass less prone to accidents.  Furthermore, Leal stated
the following regarding TxDOT’s actions after each accident:

Q [Counsel for TxDOT]:      So all of the signage that was
originally in place and any subsequent signage, or pavement markings, or any
kind of traffic advisory warning devices placed on the ramp were placed at the
direction of engineers with the Texas Department of Transportation?

 

A [Leal]:                                  Yes, sir, that’s
correct.  That’s a collaborative effort.  And as a supervisor of the signal
shop, I directed the signal shop to install those improvements and the warning
signs, the flashing beacons, the arrow boards.  I instructed the maintenance
supervisor in conjunction with the area engineer at the area office and
maintenance section.

 

All along the way, all these improvements were directed by
a professional engineer and going out in the field and field verifying and
using engineering judgment to make sure that those enhancements were put in the
proper location and they were highly visible and conspicuous.

 

Q:                                            That’s what I
asked you—was going to ask you.  Was engineering judgment involved in this, or
did maintenance just go out and haphazardly stick a sign where they thought it
ought to go?

 

A:                                            No, sir. 
Most of the time if there was any question, we would physically go out in the
field and tell them, “No, I want it moved over here instead of there.”

 

Q:                                            So the
selection of the signs and the placement of the signs, selection of the
striping, pavement markings, arrow board, traffic signal, all of that was done
under the direction of engineering judgment?

 

A:                                            Yes, sir.

 

Leal denied that the
underpass was structurally unsound.  He further denied that the signals and
signage on the underpass had malfunctioned.  He admitted that TxDOT was
responsible for maintaining the signals because the underpass was a part of the
freeway system.[5] 
Counsel for the Perches later asked Leal why different designs were not
incorporated into the underpass to make it safer.  In particular, the
Percheses’ counsel inquired why crash-cushion devices like “plastic barrels” or
“cartridges,” otherwise referred to as attenuators, were not used on the
underpass, to which Leal responded that the City of McAllen objected to the
attenuators interfering with the hiking and biking trail on the underpass and that
the attenuators would protrude too much into the roadway.  Finally, the
Percheses’ counsel asked Leal whether TxDOT was concerned about the safety of
the underpass, which he responded as follows:

A [Leal]:                                              Well,
any time there is an incident, we certainly don’t want to see that.  We
certainly want to make sure that whatever we have is safe for use.

 

. . . .

 

Q [Counsel for the Percheses]:     Are they [TxDOT]
concerned about the—as it sits there today—about that ramp?  The safety of that
ramp?

 

A:                                                        Well,
you have to kind of look at it in context.  I mean, we are certainly concerned
with the safety of [the] traveling public using it.  The facility is designed
as intended.  Of course, a lot of that is also dependent upon the user, the
driver, and there is obviously some responsibility on the driver’s side.  We
designed a structure facility to accommodate your normal prudent driver.  I
mean, your standard driver out there.  It is designed to be safe in its form or
fashion as a design basically.

 

. . . .

 

A:                                                        Like
I said, after every incident we have always gone out to make sure everything
was—nothing was—make sure everything was as it was designed and intended to be
used for, and then looked at any potential modifications or adjustments as we saw
fit.  And we have done some through the years.

 

. . . .

 

Q:                                                        Is
it fair to say, then, even after one death, after the first death, you went
through that process?

 

A:                                                        Yes,
sir, we go through that process every time.

 

Q:                                                        When
you say “every time,” every time there is a death?

 

A:                                                        Well,
no, I mean any type of a concern.  It doesn’t have to be a death.  It could be
just another incident or it could be something we run across.  Even the actual
improvements that are there can get damaged through time.  We have got to make
sure those are upright and correct and up to standard.  If there are any
changes to standards, we update them.

            

C.  
The Percheses’ Expert

 

To counter the deposition
testimony of Leal, the Percheses hired David C. Steitle, a professional
engineer.  Steitle executed an affidavit averring that he personally inspected
the Bicentennial underpass and observed many problems.  Steitle noted the
following:

As a result of the design of U.S. Expressway 83 and the intersection
of the Expressway westbound frontage road and the ramp to Bicentennial
Boulevard, the left-exit ramp violates the expectancy of normal drivers
expecting this ramp to be an entrance ramp to U.S. Expressway 83 westbound. 
Drivers who expect this to be an entrance ramp would be expected to accelerate
from the posted speed of 45 mph on the frontage road in order to merge with
expressway traffic.  It is recognized in the traffic engineering profession
that when driver expectancy is violated[,] car crashes will result.  In
addition, the vertical and horizontal profile of the ramp prevents drivers from
seeing and recognizing that the ramp ends and does not continue through the
intersection.  This design deficiency creates an unsafe condition and does not properly
warn westbound motorists that the Bicentennial ramp ends at the intersection of
Expressway 83 and Bicentennial Boulevard.

 

The traffic[-]control devices originally designed and
implemented for the Bicentennial ramp, as well as the traffic[-]control devices
that that [sic] have been implemented since the original construction, are also
deficient because they are confusing, conflicting, improper, and violate the
Texas Manual on Uniform Traffic Control Devices (“Texas MUTCD”).  Specifically,
the overhead guide sign for “McAllen-Miller [International] Airport” had a
single downward pointing arrow over the left lane.  Section 2E-18 of the Texas
MUTCD requires that when such a sign is used “Downward pointing arrows shall be
used only for overhead guide signs to prescribe lane assignment for traffic
bound for a destination or route that can be reached only by being in the
designated lane(s).”  Since the sign was incorrect and the airport could be
accessed from either the left or adjacent lane to the right, the sign infers
that the adjacent lane to the right does not access the airport and could be
reasonably expected to access the freeway.

 

In addition, the One-Direction Large Arrow signs pointing
left at the end of the Bicentennial ramp violate the Texas MUTCD.  Section
2C-09 of the Texas MUTCD states that Large Arrow Board Signs “shall be
installed on the outside of the turn or curve in line with and at approximately
a right angle to approaching traffic.”  The sign at the end of the Bicentennial
ramp was not placed in line and at a right angle with approaching traffic
because the ramp curves sharply to the left immediately before reaching the
intersection.  Further, because of the deficient design of the ramp, the Large
Arrow Board signs do not come into the driver’s view within sufficient distance
to provide advance warning to drivers to perceive and react to conditions in
the roadway, and improper and incorrect signage was used.

 

The Texas MUTCD also states that typical signs to be placed
in advance of where a driver may have to stop are Stop Ahead, Yield Ahead,
Signal Ahead, and Intersection Warning signs.  If the Signal Ahead Warning sign
had been used, the sign could have then been preceded by the Be Prepared to
Stop sign.  Instead of the appropriate sign being used, a Turn sign with a 20
mph advisory speed was placed approximately 230 feet from the intersection. 
The Turn sign is intended to warn drivers that a turn in the road is ahead and
that a recommended speed through a turn to the left is 20 mph.  The Texas MUTCD
states that these Turn signs are appropriate where a stop condition is not
necessary.  Therefore, in my opinion the wrong sign was used for the condition
for which it was intended.

 

The deficient design of the ramp coupled with the confusing,
conflicting[,] and improper traffic[-]control devices in violation of the Texas
MUTCD was a contributing factor and a proximate cause of the crash and
resulting death of Jose Luis Perches, Jr.  

 

D.  
Procedural Background

 

In their live pleading,
the Percheses filed suit against TxDOT, Dannenbaum, TEDSI, and HDR, asserting
causes of action for negligence, gross negligence, and wrongful death and
survival.[6] 
Regarding TxDOT, the Percheses asserted that the TTCA, specifically sections
101.021(2), 101.022, and 101.060 of the civil practice and remedies code,
waived TxDOT’s sovereign immunity “for claims involving personal injury or
death caused [by] the condition or use of personal[,] tangible[,] or real, and
TexDOT, if it were a real person, is liable to Plaintiffs according to Texas
law.”  See id. §§ 101.021(2), 101.022, 101.060.  The Percheses further
noted that “TexDOT’s immunity is waived because Plaintiffs’ damages were
caused, in whole or in part, by the absence, condition, or malfunction of a
traffic-control device and was not corrected by TexDOT within a reasonable time
after it knew or should have known of the defective condition or malfunction,
and the waiver of immunity is not exempted or excepted under the [TTCA].”  With
respect to their negligence cause of action against TxDOT, the Percheses
alleged that “[a]t the time of the deadly collision made the basis of this
lawsuit, the traffic signs, road signs and signal/warning devices on the
roadways approaching and on the Bicentennial Ramp were incorrect, improper,
improperly placed, confusing, and generally failed to function as intended” and
that TxDOT: 

had
actual and/or constructive notice of the faulty, improper, or defective
condition of the signs, and tangible personal or real property in general, because
of the inordinate amount of serious and deadly collisions that occurred at the
location prior to the deadly collision made the basis of this lawsuit, all of
which were subsequently investigated by TexDOT.  However, Defendant TexDOT
failed to take proper corrective action to make the Bicentennial Ramp safe by
implementing proper traffic control devices and/or corrective action to the
property in general, that would convey the proper and intended
traffic[-]control information and function. 

 

In addition to their
causes of action, the Percheses applied for a permanent injunction, under
section 65.011(1)-(3), (5) of the civil practice and remedies code and article
I, section 19 of the Texas Constitution to enjoin TxDOT from re-opening the
Bicentennial underpass.  See id. § 65.011(1)-(3), (5) (Vernon 2008); see
also Tex. Const. art. 1, §
19.  In particular, the Percheses noted that:

If a permanent injunction is not granted, harm is imminent
to Plaintiffs and the general motoring public because numerous prior injuries
and deaths have occurred at the location as a proximate result of inadequate
and unsafe design, construction, signage, and/or traffic and road control
devices, including but not limited to the condition of the current signage
and/or traffic and road control devices of the Bicentennial ramp violated the
City of McAllen ordinances regarding such devises [sic], resulting in imminent
harm to Plaintiffs and the motoring public in general if a permanent injunction
is not issued.  In addition, the harm that will result if a permanent
injunction is not issued is irreparable because of the danger to Plaintiffs and
the motoring public in general which likely will result in serious injury or
death in the future.

 

TxDOT answered the
Percheses’ lawsuit and filed a plea to the jurisdiction, arguing that it was immune
from liability because the Percheses’ lawsuit complained about design decisions
that TxDOT made regarding the Bicentennial underpass.  TxDOT also contended
that the Percheses cannot claim that TxDOT’s immunity was waived for allegedly
maintaining the underpass in a negligent manner.  Finally, TxDOT asserted that: 
(1) the trial court lacked jurisdiction to issue a permanent injunction,
forcing TxDOT to close the underpass, because the state highway system is
governed by the Texas Highway Commission, not the judiciary; (2) the Percheses
could not control State actions in the absence of legislative consent or
statutory authorization; (3) there is no “implied private right of action for
damages against governmental entities for violations of the Texas Constitution”;
and (4) a party may not seek to enjoin the activities of a state agency but
rather should sue an individual in authority at the state agency, which the
Percheses did not do in this case.

In their first amended
response to TxDOT’s plea to the jurisdiction, the Percheses contended that
TxDOT’s immunity is waived because their claims:  (1) are not “design-related”
but rather arise under section 101.021(2) of the civil practice and remedies
code; and (2) involved death caused by a traffic-control devices that were not
functioning as intended, in accordance with section 101.060(a)(2) of the civil
practice and remedies code.  See Tex.
Civ. Prac. & Rem. Code Ann. §§ 101.021(2), 101.060(a)(2).  The
Percheses further argued that the trial court was empowered to grant a permanent
injunction under article V, section 8 of the Texas Constitution, section
65.021(a) of the civil practice and remedies code, and section 34.007 of the
government code; and that “suits against a governmental entity for violation of
a constitutional right are not prohibited, nor does the entity retain immunity
from suit merely because it is an injunction.”  See id. § 65.021(a)
(Vernon 2008); see also Tex.
Const. art. V, § 8; Tex. Gov’t
Code Ann. § 24.007 (Vernon 2004).[7]

On March 16, 2010, the
trial court conducted a hearing on TxDOT’s plea to the jurisdiction.  After
considering the plea and all pleadings on file, the trial court denied TxDOT’s
plea to the jurisdiction and severed the Percheses’ causes of action against
TxDOT from the causes of action asserted against the remaining engineering
firms.  This accelerated, interlocutory appeal ensued.  See Tex. R. App. P. 28.1; see also Tex. Civ. Prac. & Rem. Code Ann. §§
51.014(a)(8) (Vernon 2008), 101.001(3)(B) (Vernon 2005).     

II.           
Plea to the Jurisdiction

 

In its first issue, TxDOT
argues that the Percheses’ claims center on the “selection and placement of
traffic signs and traffic[-]control devices,” which fall within the “design
discretion immunity” afforded TxDOT.  TxDOT further argues that the MUTCD “provides
standards for [the] design and application of traffic[-]control devices, but
does not serve as a legal requirement for installation.”  Thus, any variations
from the recommendations of the MUTCD do not create an actionable “condition of
sign” claim under section 101.060 of the civil practice and remedies code.  See
Tex. Civ. Prac. & Rem. Code Ann.
§ 101.060.   The Percheses respond that TxDOT’s immunity was waived pursuant to
section 101.060(a)(2) “because of the high number of crash incidents and deaths
at the Ramp put TexDOT on notice of this condition which it . . . failed to
correct prior to the Plaintiff’s [Percheses’] crash on November 6, 2008.”  See
id. § 101.060(a)(2).  The Percheses further contend that TxDOT failed to
maintain existing traffic-control devices by not  restriping the left turn
arrows on the pavement and that the concrete barrier at the end of the
“T-intersection” is a special defect under sections 101.021(2) and 101.022(b)
of the civil practice and remedies code.  See id. §§ 101.021(2),
101.022(b). 

A.  
Standard of Review

 

A plea to the
jurisdiction is considered a dilatory plea, which challenges a trial court’s
authority to hear a cause of action without regard to the merits of the claim. 
Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000).  The
plea challenges the trial court’s subject-matter jurisdiction.  Id.; see
Tex. Dep’t of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999).  Whether a
trial court has subject-matter jurisdiction and whether the pleader has alleged
facts that affirmatively demonstrate the trial court’s subject-matter
jurisdiction are questions of law that we review de novo.  Tex. Dep’t of
Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004); Tex.
Natural Res. Conservation Comm’n v. IT-Davy, 74 S.W.3d 849, 855 (Tex.
2002).

            The plaintiff has the burden to plead
facts affirmatively showing that the trial court has jurisdiction.  Tex.
Ass’n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993); Univ.
of N. Tex. v. Harvey, 124 S.W.3d 216, 220 (Tex. App.–Fort Worth 2003, pet.
denied).  We construe the pleadings liberally in favor of the pleader, look to
the pleader’s intent, and accept as true the factual allegations contained in
the pleadings.  See Miranda, 133 S.W.3d at 226, 228; City of Fort
Worth v. Crockett, 142 S.W.3d 550, 552 (Tex. App.–Fort Worth 2004, pet.
denied).  If a plea to the jurisdiction challenges the existence of
jurisdictional facts, we consider relevant evidence submitted by the parties
when necessary to resolve the jurisdictional issues raised, as the trial court
is required to do, even those facts which may implicate the merits of the cause
of action.  Miranda, 133 S.W.3d at 227; Blue, 34 S.W.3d at 555
(confining evidentiary review to evidence that is relevant to the
jurisdictional issue); see City of Waco v. Kirwan, 298 S.W.3d 618, 622
(Tex. 2009).

            A trial court’s review of a plea to
the jurisdiction challenging the existence of jurisdictional facts mirrors that
of a traditional motion for summary judgment.  Miranda, 133 S.W.3d at
228; see Tex. R. Civ. P.
166a(c).  The governmental unit is required to meet the summary judgment
standard of proof for its assertion that the trial court lacks jurisdiction.  Miranda,
133 S.W.3d at 228.  Once the governmental unit meets its burden, the plaintiff
is then required to show that there is a disputed material fact regarding the
jurisdictional issue.  Id.  If the evidence creates a fact question
regarding jurisdiction, the trial court must deny the plea to the jurisdiction
and leave its resolution to the fact-finder.  Id. at 227-28.  But, if
the evidence is undisputed or fails to raise a fact question on the jurisdictional
issue, the trial court rules on the plea to the jurisdiction as a matter of
law.  Id. at 228.

            “In considering this evidence, we ‘take
as true all evidence favorable to the nonmovant’ and ‘indulge every reasonable
inference and resolve any doubts in the nonmovant’s favor.’”  Kirwan,
298 S.W.3d at 622 (quoting Miranda, 133 S.W.3d at 228).  Further, a
defendant cannot simply deny the existence of jurisdictional fact and force the
plaintiff to raise a fact issue.  See Johnson v. Brewer & Pritchard,
P.C., 73 S.W.3d 193, 207 (Tex. 2002); see also County of Cameron v.
Brown, 80 S.W.3d 549, 555 (Tex. 2002) (“In deciding a plea to the
jurisdiction, a court may not weigh the claims’ merits but must consider only
the plaintiffs’ pleadings and evidence pertinent to the jurisdictional
inquiry.”).

B.  
Sovereign and Design-Discretion Immunity

 

Under the common law,
sovereign or governmental immunity defeats a trial court’s subject-matter
jurisdiction.  See Harris County v. Sykes, 136 S.W.3d 635, 638 (Tex.
2004).  The TTCA provides a limited waiver of immunity for “personal injury and
death so caused by a condition or use of tangible personal or real property if
the governmental unit would, were it a private person, be liable to the
claimant according to Texas law.”  Tex.
Civ. Prac. & Rem. Code Ann. § 101.021.  For premise-defect claims,
the governmental unit generally “owes to the claimant only the duty that a
private person owes to a licensee,” unless the claim involves special defects
or “the duty to warn of the absence, condition, or malfunction of
[traffic-control devices] as is required by Section 101.060.”  Id. §
101.022(a), (b).

            However, there are certain exceptions to
the waiver of immunity under the TTCA, including when a claim arises from:

(1) 
the failure of a governmental
unit to perform an act that the unit is not 

required by law to perform; or

 

(2) 
a governmental unit=s decision not to perform an act or . . . its failure to 

make a decision on the performance or nonperformance
of an act if the law leaves the performance or nonperformance of the act to the
discretion of the governmental unit.

 

Id. § 101.056.  “In other words, the State remains
immune from suits arising from its discretionary acts and omissions.”  Tex.
Dep’t of Transp. v. Garza, 70 S.W.3d 802, 806 (Tex. 2002).  Similarly,
under section 101.060(a), the TTCA does not waive immunity for claims arising
from Athe failure of a governmental unit initially to
place a traffic or road sign, signal, or warning device if the failure is a
result of discretionary action of the governmental unit@ and Athe absence, condition, or malfunction of a traffic
or road sign, signal, or warning device unless the absence, condition, or
malfunction is not corrected by the responsible governmental unit within a
reasonable time after notice.@  Id. ' 101.060(a)(1)-(2).  “Under subsection (a)(1), the
State retains immunity for discretionary sign-placement decisions.”  State
ex rel. State Dep’t of Highways & Pub. Transp. v. Gonzalez, 82 S.W.3d
322, 326-27 (Tex. 2002).  “Under subsection (a)(2), the State retains immunity
as long as it corrects a sign’s defective [condition, absence, or malfunction]
within a reasonable time after notice.”  Id.

1.   
The Selection and Placement of Signage and Signals on the
Underpass

 

            Here, the Percheses argue that TxDOT
was negligent in maintaining the signage and signals on the Bicentennial
underpass and that the signage and signals did not operate as intended.  The
Percheses further argue that the signage and signals conveyed the wrong traffic
information and confused drivers, which led to numerous accidents on the
underpass.  In support of their arguments, the Percheses cite to Steitle’s
expert report, wherein he repeatedly alleges that TxDOT’s placement of signage
and signals on the underpass did not provide sufficient warning to drivers that
they could only turn left onto the bridge, or in other words, the placement of
the signage and signals was not adequate to warn drivers.  In fact, Steitle
noted that TxDOT’s “design deficiency” of the underpass “violates the
expectancy of normal drivers” and “creates an unsafe condition and does not
properly warn westbound motorists that the Bicentennial ramp ends at the
intersection of Expressway 83 and Bicentennial Boulevard.”  Steitle further
suggests several alternative signs that TxDOT should have placed on the
underpass to reduce drivers’ confusion while traveling on the underpass.  See
Siders v. State, 970 S.W.2d 189, 193 (Tex. App.–Dallas 1998, pet. denied)
(“Lights, signs, and safety features are part of a roadway design; therefore,
the placement of stop signs and other safety features are discretionary in
nature and cannot give rise to liability under the Tort Claims Act.”); Tex.
Dep’t of Transp. v. Ramirez, 74 S.W.3d 864, 867 (Tex. 2002) (holding that the
TTCA does not waive sovereign immunity for roadway design).  

            Texas courts have held that the
placement of signage and signals is a discretionary design decision and that
the State retains immunity for such decisions.  See Gonzalez, 82 S.W.3d
at 326-27 (explaining that the State retains immunity for its decision relative
to “where” signs should be located); Johnson v. Tex. Dep’t of Transp.,
905 S.W.2d 394, 398 (Tex. App.–Austin 1995, no writ) (holding that the location
of where to place a sign is a discretionary design decision).  Moreover, in City
of Grapevine v. Sipes, the Texas Supreme Court considered whether a city’s
failure to install a traffic signal, after deciding to do so, fell under the
portion of section 101.060(a)(2) allowing claims to be brought under the TTCA
when the absence of a traffic-control device is not remedied within a
reasonable time after notice.  195 S.W.3d 689, 692-95 (Tex. 2006).  Construing
section 101.060(a)(2) in light of section 101.060(a)(1), the court concluded
that the timing of implementation is discretionary:

When the City first installs a traffic signal is no
less discretionary than whether to install it.  The timing of
implementation could be affected by the governmental unit’s balancing of
funding priorities, scheduling, traffic patterns, or other matter; to impose
liability for the failure to timely implement a discretionary decision could
penalize a governmental unit for engaging in prudent planning and paralyze it
from making safety-related decisions.  This sort of planning and execution is
precisely the type of discretionary act for which the TTCA retains immunity. 
Thus, when subsections (a)(1) and (a)(2) are read together, (a)(2) logically
applies only to those traffic signals that have already been installed.

 

Id. at 694 (emphasis in original); see
State v. San Miguel, 2 S.W.3d 249, 251 (Tex. 1999) (per curiam)
(interpreting section 101.056 and holding that a governmental unit’s plans
regarding the safety features of a roadway are discretionary).  Thus, based on
the foregoing case law, we reject Steitle’s conclusions to the extent that he
argues that TxDOT did not implement appropriate signage and signals within a
reasonable time after each incident.

Steitle later asserts that
TxDOT’s immunity was waived because it failed to comply with the MUTCD in
designing the underpass and in placing the signage and signals.  Specifically,
Steitle lists several instances where the signage and signals on the underpass
do not explicitly comply with the MUTCD.  We first note that compliance with
the MUTCD’s provisions is generally not mandatory.  See Brazoria County v.
Van Gelder, 304 S.W.3d 447, 454 (Tex. App.–Houston [14th Dist.] 2009, pet.
denied); Tex. Dep’t of Transp. v. Andrews, 155 S.W.3d 351, 359 (Tex.
App.–Fort Worth 2004, pet. denied) (citing State Dep’t of Highways &
Pub. Transp. v. King, 808 S.W.2d 465, 466 (Tex. 1991)); Bellnoa v. City
of Austin, 894 S.W.2d 821, 824 (Tex. App.–Austin 1995, no writ).  Moreover,
Leal noted in his deposition testimony that TxDOT consulted with several
engineering firms and exercised engineering judgment in determining where to
place signs and signals on the underpass, though such placement may have deviated
from the MUTCD.  Because TxDOT exercised engineering judgment in the placement
of the signage and signals and because the MUTCD’s provisions are not
mandatory, we reject Steitle’s assertion that TxDOT’s immunity was waived for
failing to comply with the MUTCD.  See State v. Rodriguez, 985 S.W.2d
83, 86 (Tex. 1999) (“The State’s area engineer, Norrell, stated that when the
accident occurred, his office had designed the existing warning signs according
to his best engineering judgment.  Thus, the State did not waive its immunity
for warning signage.”); see also King, 808 S.W.2d at 466; Van Gelder,
304 S.W.3d at 454; Andrews, 155 S.W.3d at 359; Bellnoa, 894
S.W.2d at 824. 

2.   
Negligent Implementation and Defective Conditions Under Section
101.060(a)(2)

 

The Percheses also allege
that TxDOT’s use of confusing and misleading signage and signals constituted
negligent implementation of TxDOT’s policy to operate the Bicentennial
underpass safely.  They also argue that the signage and signals constituted
defective conditions under section 101.060(a)(2) because they were “wrong,
confusing, conflicting, and/or improperly placed.”  See Tex. Civ. Prac. & Rem. Code Ann. §
101.060(a)(2). 

A governmental unit is
not immune from liability for an injury caused by a premise defect that was
created through negligent implementation of policy.  See Mogayzel v. Tex.
Dep’t of Transp., 66 S.W.3d 459, 465-66 (Tex. App.–Fort Worth 2001, pet.
denied).  Further, a governmental unit’s negligence in implementing a
formulated policy is not a discretionary function.  See Mitchell v. City of
Dallas, 855 S.W.2d 741, 745 (Tex. App.–Dallas 1993), aff’d, 870
S.W.2d 21 (Tex. 1994).  “[S]overeign immunity is preserved for the negligent
discretionary formulation of policy, but not for the negligent implementation
of the policy at the [operational/ministerial] level.”  Guadalupe-Blanco
River Auth. v. Pitonyak, 84 S.W.3d 326, 342 (Tex. App.–Corpus Christi 2002,
no pet.).  Further, a governmental unit does not relinquish its discretion
relative to roadway design by implementing a general policy to operate roads
safely.  See Tarrant County Water Control & Improvement Dist. No. 1. v.
Crossland, 781 S.W.2d 427, 433 (Tex. App.–Fort Worth 1989, writ denied)
(holding that the State’s alleged policy to “warn of danger” did “not make the
State liable for all possible failures to warn.  The State may still make
specific policy decisions about the design of State projects . . .”), overruled
on other grounds by City of Dallas v. Mitchell, 870 S.W.2d 21, 23 (Tex.
1994).  “In other words, a general policy to build safe roads does not expose a
governmental unit to liability for every conceivable safety deficiency under a
negligent implementation of policy theory recovery.”  Tex. Dep’t of Transp.
v. Olivares, 316 S.W.3d 89, 100 (Tex. App.–Houston [14th Dist.] 2010, no
pet.).  

Furthermore, a
“condition” under section 101.060(a)(2) is defined as “something ‘wrong’ with
the traffic sign or signal such that it would require correction by the State
after notice.”  Garza, 70 S.W.3d at 807; see also Sparkman v. Maxwell,
519 S.W.2d 852, 858 (Tex. 1975) (defining “condition” as “either an intentional
or an inadvertent state of being”).  The term also “refers to the maintenance
of a sign or signal in a condition sufficient to properly perform the function
of traffic control for which it is relied upon by the traveling public.”  Lawson
v. McDonald’s Estate, 524 S.W.2d 351, 356 (Tex. Civ. App.–Waco 1975, writ
ref’d n.r.e.).  “[I]n the cases in which [the Texas Supreme Court] has
interpreted ‘condition’ in the context of road signs and signals, [it has]
found a waiver of immunity only in those situations in which the sign or signal
was either (1) unable to convey the intended traffic control information, or
(2) conveyed traffic control information other than what was intended.”  Garza,
70 S.W.3d at 807; see also Gonzalez, 82 S.W.3d at 327 (“[S]ubsection
101.060(a)(2) requires the State to maintain traffic signs in a condition
sufficient to perform their intended traffic-control function.”).  

In this case, the
Percheses do not adequately explain how TxDOT’s implementation of the signage
and signals was negligent.  Regardless, the Percheses’ reference to their
negligent implementation allegation in their live pleading implies that TxDOT’s
immunity was waived because it was negligent in implementing traffic-control
devices to further its general policy to build and maintain safe roads, an
allegation that Texas courts have held does not expose a governmental unit to
liability.  See Olivares, 316 S.W.3d at 100; see also Crossland,
781 S.W.2d at 433.  

With regard to the
Percheses’ section 101.060(a)(2) contention, Leal testified that all of the
signals and signage were functioning properly and clearly indicated that only a
left turn could be made at the “T-intersection” by westbound drivers.  Steitle
did not opine that the signals and signage were malfunctioning; rather, he suggested
that they did not properly warn motorists of the impending left turn because of
TxDOT’s placement of the signage and signals.  In essence, the Percheses’
contention that the signage and signals were confusing and misleading and,
thus, constituted a “condition” under section 101.060(a)(2) implicates the
adequacy of the devices chosen by TxDOT, a discretionary-design decision for
which immunity is not waived.  See San Miguel, 2 S.W.3d at 251 (“A court
should not second-guess a governmental unit’s decision about the type of marker
or safety device that is most appropriate.”); Tex. Dep’t of Transp. v.
Bederka, 36 S.W.3d 266, 271 (Tex. App.–Beaumont 2001, no pet.) (“Department
enjoys immunity from suit regarding its decision to place a particular traffic
control signal, even if the signal fails to make the premises safe.  The
selection of the device employed is not its condition.”), overruled on other
grounds by Sipes, 195 S.W.3d 689; see also Olivares, 316 S.W.3d at 100-01.

3.   
Negligent Maintenance of Existing Traffic-Control Devices

 

            Next, the Percheses contend that TxDOT
failed to maintain existing traffic-control devices by failing to restripe
left-turn arrows on the pavement.  In support of their argument, the Percheses
note that the left-turn arrows on the pavement had last been painted in 2005,
more than three years before this incident.  The Percheses also direct us to
photographs attached to their appellate brief that apparently were taken on May
11, 2009, by their trial counsel, and demonstrated that some of the striping
was faded.  

We first note that these
photographs were not formally included in the record and, thus, cannot be
considered on appeal.  See Cantu v. Horany, 195 S.W.3d 867, 870 (Tex.
App.–Dallas 2006, no pet.) (“An appellate court cannot consider documents cited
in a brief and attached as appendices if they are not formally included in the
record on appeal.”); Till v. Thomas, 10 S.W.3d 730, 733 (Tex.
App.–Houston [1st Dist.] 1999, no pet.) (same); Pisharodi v. Saldana,
No. 13-09-00552-CV, 2011 Tex. App. LEXIS 582, at *12 (Tex. App.–Corpus Christi
Jan. 27, 2011, no pet. h.) (mem. op.) (same).  Moreover, these photographs were
taken more than six months after Perches’s death and do not appear to
accurately depict the condition of the underpass’s striping at the time of the
accident.  In addition, the Percheses do not direct us to any evidence in the
record to suggest that the left-turn arrows on the pavement were required to be
restriped more frequently than every three years.  Rather, Leal testified that
the selection of striping required the exercise of engineering judgment on the
part of TxDOT, which does not waive TxDOT’s immunity.  See Rodriguez,
985 S.W.2d at 86.  Given the lack of competent evidence in the record addressing
this contention, we cannot say that TxDOT negligently maintained the overpass
by failing to restripe the left-turn arrows. 

Based on the foregoing, we
cannot say that the Percheses plead sufficient facts to affirmatively
demonstrate that TxDOT waived immunity under the TTCA and that the trial court
had jurisdiction with respect to the Percheses’ ordinary premises liability
claims.  See Miranda, 133 S.W.3d at 227; Tex. Ass’n of Bus., 852
S.W.2d at 446; see also Harvey, 124 S.W.3d at 220.  Nevertheless, the
Percheses also alleged special defects claims, which warrant additional
discussion.

C.  
Special Defects Under Sections 101.021(2) and 101.022(b)

 

Premises liability claims
under the TTCA not only take the form of ordinary premises defects but also
special defects.  See Tex. Civ.
Prac. & Rem. Code Ann. § 101.022; see also City of Mission v.
Cantu, 89 S.W.3d 795, 807 (Tex. App.–Corpus Christi 2002, no pet.).  The
TTCA does not define “special defect,” but section 101.022(b) “likens it to
‘excavations or obstructions’ that exist ‘on’ the roadway surface.”  Denton
County v. Beynon, 283 S.W.3d 329, 331 (Tex. 2009) (quoting Tex. Civ. Prac. & Rem. Code Ann. §
101.022(b)).  A special defect cannot be a condition that falls outside that
class.  See Tex. Dep’t of Transp. v. York, 284 S.W.3d 844, 847 (Tex.
2009); see also Beynon, 283 S.W.3d at 331-32 (noting that “a court
cannot ‘classify as “special” a defect that is not like an excavation or
obstruction on a roadway.’”) (quoting State Dep’t of Highways & Pub.
Transp. v. Payne, 838 S.W.2d 235, 239 n.3 (Tex. 1992)).  

If a claim involves a
special defect, the “State owes the same duty to warn as a private landowner
owes to an invitee, one that requires the State ‘to use ordinary care to
protect an invitee from a dangerous condition of which the owner is or
reasonably should be aware.’”  Beynon, 283 S.W.3d at 331 (quoting Payne,
838 S.W.2d at 237).  Actual knowledge is not required; the plaintiff need only
prove the governmental unit should have known of a condition that created an
unreasonably risk of harm.  York, 284 S.W.3d at 847 (citing Payne,
838 S.W.2d at 237).  The determination of whether a condition is a premises
defect or a special defect is a question of law.  See id.  

            In York, the supreme court
described characteristics of this class that a court may consider in
determining whether a condition of property is a special defect:

·        
Size of the dangerous condition.  See County of Harris v.
Eaton, 573 S.W.2d 177, 179 (Tex. 1978) (finding a large hole six to ten
inches deep and four to nine feet wide that covered 90% of the road’s width was
a special defect);

 

·        
Some unusual quality outside the ordinary course of events.  See
City of Dallas v. Reed, 258 S.W.3d 620, 622 (Tex. 2008) (finding a two-inch
difference in elevation between traffic lanes on a roadway was not a special
defect) (citing City of Grapevine v. Roberts, 946 S.W.2d 841, 843 (Tex.
1997) (concluding that a partially cracked and crumbled sidewalk was not a
special defect));

 

·        
Something that “unexpectedly and physically impair[s] a car’s
ability to travel on the road.”  Rodriguez, 985 S.W.2d at 85-86 (finding
a ninety-degree turn in a detour from a road construction project was not a
special defect); and

 

·        
“An unexpected and unusual danger to ordinary users of
roadways.”  Payne, 838 S.W.2d at 238 (finding a culvert beneath a
roadway was not a special defect)

 

York, 284 S.W.3d at 847-48 (concluding that
a layer of loose gravel on a road does not constitute an obstruction or
excavation and, thus, is not a special defect).

            Here, the Percheses allege that the
concrete barrier placed at the end of the “T-intersection” constituted “a
special defect for which TexDOT’s immunity is waived.”  Leal testified that
attenuators are not considered a part of traffic signage; rather, they are
“more of a structural component.”  He further noted that attenuators often
contain crash cushions and energy-absorption devices used to lessen the impact
of collisions.  Leal stated that TxDOT did not include any attenuators at the
“T-intersection” because they would protrude into the lanes of traffic,
especially considering the narrowness of the Bicentennial underpass, and
because the City of McAllen did not want the attenuators to block the hiking
and biking lane on the underpass bridge.  A design schematic produced by
Dannenbaum, designated as exhibit 4, clearly indicates that TxDOT’s engineers
highly recommended that attenuators be placed at the end of the ramp at the
“T-intersection.”  The record also indicates that Brown & Gay recommended
the implementation of attenuators at the “T-intersection.”  When asked why
TxDOT refused to implement attenuators at the end of the ramp, Leal stated
that:

There is [sic] a couple issues with that.  Those energy
absorption devices were, at the time, we were really brainstorming to look at
what could possibly be done.  The reality of it was once we started looking at
the intent and the use for it, there really wasn’t any such design to fit that
configuration. 

 

            Most
of the energy absorption devices that we use are usually on the blunt end of a
barrier or a column protecting a point or a very identified specific
area—contained area.  And most of those, when you get into high speeds,
normally require that you have a long bay in order to absorb that energy and
dissipate that energy to get there.

 

            Those
are the standard designs that you run into when you do those type of things. 
In this particular instance, there was no such preset design.  The fact that
the barrier had a very short distance from a little buffer area in the travel
lane didn’t lend itself to have something—without hindering traffic and without
hindering the southbound lane—protruding into the southbound lane to get enough
dip in it to be able to have enough units to absorb the energy, especially at a
high rate of speed, 70 miles an hour or so, there was no device designed for
that particular brainstorming.

 

            If
there was to be a way to design something like this, how could it be done?  And
that’s kind of the charge that the engineer had.  And short of having to extend
on the bridge to have enough base to absorb that energy without protruding into
the lanes, made it a more difficult proposition to implement.  In other words,
you can’t design something to stop you on a dime if you are going 70 miles per
hour.  You don’t have the room.

 

Essentially, in his
explanation as to why TxDOT did not implement any attenuators at the
“T-intersection,” Leal acknowledged that the design of the intersection is too
narrow and that vehicles often drive on the ramp at high rates of speed.  Therefore,
rather than widening the bridge or placing attenuators which could buffer and
potentially lessen the impact of a collision occurring at the intersection,
TxDOT, instead, chose to implement a concrete wall without any energy-absorption
devices.  As a result, more than four and possibly eight vehicles have
contacted the unforgiving concrete barrier and plummeted more than twenty feet
to the roadway underneath, resulting in certain death rather than minor
property damage.  Also, it is noteworthy that Leal admitted later in his
testimony that he was not aware of any deaths occurring at the “T-intersection”
by drivers travelling north and south over the bridge, demonstrating that all
of the numerous deaths transpiring at this intersection have occurred as a
result of the ramp, the narrow intersection, and the sharp left-turn required. 


Based on our understanding
of the design of the Bicentennial underpass, we believe that the concrete
barrier at the “T-intersection” constitutes an obstruction within the meaning
of section 101.022(b) because it impedes the ability of vehicles, which must
accelerate to proceed up the underpass ramp, to make a safe left turn during
the normal course of travel, especially considering the narrowness of the
intersection.  See Tex. Civ. Prac.
& Rem. Code Ann. § 101.022(b); see also Reyes v. City of Laredo,
No. 09-1007, 2010 Tex. LEXIS 891, at *4 (Tex. Dec. 3, 2010) (per curiam)
(defining an “obstruction” as “an impediment or a hindrance”); Beynon,
283 S.W.3d at 332 (noting that the supreme court’s special-defect jurisprudence
turns on the objective expectations of an “ordinary user” who follows the
“normal course of travel”); Rodriguez, 985 S.W.2d at 85-86 (noting that
a special defect is something that “unexpectedly and physically impair[s] a
car’s ability to travel on the road”).

In support of our conclusion, we find
the First Court of Appeals’ decision in Harris County v. Estate of Ciccia
to be especially significant.  125 S.W.3d 749, 751 (Tex. App.–Houston [1st
Dist.] 2003, pet. denied).  In Estate of Ciccia, a car carrying several
passengers crashed into a concrete culvert located at the end of an unfinished
and unlit roadway, an accident which resulted in the death of one of the
passengers.  Id. at 751.  The court described the roadway as follows:  

As part of a capital improvement road project in
Harris County, a median and several turn lanes were constructed on
Barker-Cypress road near Keith Harrow Boulevard on what had previously been an
undivided four-lane road.  The engineering plans included a right-hand turn
lane, intended to serve a proposed concrete plant, that was marked with
striping, arrows, and the words “right turn only” on the road surface.

 

            The lane was designed to turn into the
driveway of the plant, but the plant was never built and no driveway was
necessary.  The designated right-hand turn lane remained, however, simply
ending abruptly.  At a later time, after this turn lane was constructed, the
County permitted the telephone company to add a concrete culvert several yards
beyond the end of the turn lane.  This section of road was not lit; there were
neither barricades nor signs to warn drivers that the road simply stopped short
of a ditch containing a culvert. 

 

Id. at 752.  The pleadings alleged claims for negligent
road design, premise defect, and special defect.  Id.  The First Court
of Appeals concluded that the concrete culvert located beyond the end of the
road onto which the “right turn only” lane directed traffic satisfied the
definition of a special defect because it is an excavation or obstruction that
unexpectedly and physically impaired the car’s ability to travel on the
roadway.  Id. at 754-55.  In particular, there was no signage or signal
indicated that the road simply ended.  Because the concrete culvert was
determined to be a special defect and the county was aware of the dangerous
condition, the county had a duty to warn of the special defect.  Id. at
755.  As a result, the First Court of Appeals affirmed the trial court’s denial
of Harris County’s plea to the jurisdiction.  Id.

            Like the roadway in Estate
of Ciccia, the ramp at the Bicentennial underpass abruptly ends.  Moreover,
the signage used by TxDOT merely indicates that westbound drivers should make a
left turn at the intersection; it does not clearly indicate that the road ends
at the ramp’s “T-intersection.”  Further, the record does not describe the
lighting at the “T-intersection”; however, it seems particularly important that
all of the accidents at this intersection have occurred from midnight to 4:00
a.m., a time in which the lighting at the intersection may have been
insufficient.  Based on this, we, like the First Court of Appeals, are inclined
to conclude that the concrete barrier constitutes a special defect which waives
the governmental unit’s immunity under section 101.022(b). 

Moreover, the use of
“T-intersections” at the end of exit ramps from highways where the posted speed
limit is sixty miles per hour appears to be uncommon and constitutes an unexpected
and unusual danger to ordinary users of roadways, especially considering the
ramp’s proximity to U.S. Highway 83 and the vertical incline, which requires
drivers to accelerate to proceed up the ramp.  See York, 284 S.W.3d at 847;
Payne, 838 S.W.2d at 238; see also Beynon, 283 S.W.3d at 332 (explaining
that the supreme court’s special defects “case rest on the objective
expectation of an ‘ordinary user,’ and such a driver would not be expect to
careen uncontrollably off the paved roadway”); City of Weston v. Gaudette,
287 S.W.3d 832, 837 (Tex. App.–Dallas 2009, no pet.) (same).  Like Beynon,
ordinary drivers driving on the Bicentennial underpass ramp approaching the
“T-intersection” “would not be expected to careen uncontrollably off the . . .
roadway” because of the narrowness of the intersection, the ending of the road
at the “T-intersection,” and the special defect—the minimal concrete barrier.  See
Beynon, 283 S.W.3d at 331-32 (“‘Whether on a road or near one,’ conditions
can be special defects like excavations or obstructions ‘only if they pose a
threat to the ordinary users of a particular roadway.’”) (quoting Payne,
838 S.W.2d at 238 n.3).  

Given the large number of
fatal accidents that have occurred at the “T-intersection” during the underpass’s
brief existence, it is clear to this Court that the Bicentennial underpass is a
dangerous roadway or “death trap”; that TxDOT was aware of the dangerous
roadway; and that the concrete barrier at the end of the “T-intersection”
constitutes a special defect, which impedes the ability of ordinary motorists
to safely traverse the underpass during the normal course of travel.  Because
we have found that concrete barrier constitutes a special defect, we conclude
that TxDOT’s immunity was waived pursuant to section 101.022(b).  See Tex. Civ. Prac. & Rem. Code Ann. §
101.022(b); see also State Dep’t of Highways & Pub. Transp. v. Kitchen,
867 S.W.2d 784, 786 (Tex. 1993) (per curiam) (“Absent a finding that the State
knew of the dangerous condition prior to the accident, it is not liable to
plaintiffs unless the condition was a special defect.”) (citing Payne,
838 S.W.2d at 237); City of Dallas v. Giraldo, 262 S.W.3d 864, 869 (Tex.
App.–Dallas 2008, no pet.) (noting that “[t]he Legislature has provided a
limited waiver of immunity for premise defect and special defect claims under
the Texas Tort Claims Act” while citing to section 101.022 of the civil
practice and remedies code). 

Because we have concluded
that the Percheses have pleaded sufficient facts to demonstrate that TxDOT’s
immunity was waived with respect to the Percheses’ special defects claims, we conclude
that the trial court did not err in denying TxDOT’s plea to the jurisdiction.  See
Miranda, 133 S.W.3d at 227-28; Tex. Ass’n of Bus., 852 S.W.2d at
446; see also Harvey, 124 S.W.3d at 220.  We overrule TxDOT’s first
issue.    

III.          
Permanent Injunction

 

In its second issue,
TxDOT asserts that the trial court lacked subject-matter jurisdiction to grant
the Percheses’ request for injunctive relief, which resulted in the permanent
closure of the Bicentennial underpass.  However, the record does not reflect
that the trial court ruled upon the Percheses’ request for injunctive relief.  

            Texas Rule of Appellate Procedure
34.5(a)(5) requires that the “court’s judgment or other order that is being
appealed” be included in the clerk’s record.  Tex.
R. App. P. 34.5(a)(5).  The only order included in the clerk’s record is
the trial court’s denial of TxDOT’s plea to the jurisdiction.  It does not
appear that the trial court entered an order granting a permanent injunction,
thus enjoining TxDOT from operating the Bicentennial underpass; therefore, TxDOT’s
appellate complaint addressing the purported permanent injunction is premature
or, in other words, not ripe for our review.  See Patterson v. Planned
Parenthood, 971 S.W.2d 439, 442 (Tex. 1998) (noting that ripeness, like
standing, is a threshold issue that implicated subject-matter jurisdiction and
that the doctrinal purpose of ripeness is to prevent premature adjudication); see
also Fulp v. Miller, 286 S.W.3d 501, 513 (Tex. App.–Corpus Christi 2009, no
pet.) (op. on reh’g) (same); City of Weslaco v. Borne, 210 S.W.3d 782,
787 (Tex. App.–Corpus Christi 2006, pet. denied) (same).  Moreover, in its
notice of accelerated appeal, TxDOT only mentions that it desired to appeal the
trial court’s March 29, 2010 order denying TxDOT’s plea to the jurisdiction.  See
Tex. R. App. P. 25.1(d)(2)
(requiring appellant to file a notice of appeal stating, among other things,
“the date of the judgment or order appealed from”).  Because TxDOT’s arguments
pertaining to the purported permanent injunction are premature and because
TxDOT specified in its accelerated notice of appeal that it desired to appeal
only the trial court’s March 29, 2010 order denying TxDOT’s plea to the
jurisdiction, we conclude that TxDOT failed to preserve its second issue for
appeal.[8] 
See Tex. R. App. P. 25.1(d)(2),
26.1 (providing that an appeal is perfected when a compliant notice of appeal
is filed); see also Parrish v. Rutherford, 159 S.W.3d 114, 117 (Tex.
App.–Corpus Christi 2004, no pet.) (holding that an issue was not preserved for
appeal because appellants’ notice of appeal failed to specify the order from
which the purported issue arose).  

IV.         
Conclusion

 

Having concluded that the Percheses have pleaded sufficient
jurisdictional facts to demonstrate that TxDOT’s immunity was waived with
respect to the their special-defects claims, we affirm the trial court’s March
29, 2010 order denying TxDOT’s plea to the jurisdiction.

_________________

                                                                                                Rogelio Valdez

                                                                                                Chief
Justice

 

Delivered and filed the


24th day of March, 2011.

 









[1] Jesus S. Leal,
the Director of Transportation and Operations for the Pharr district of the
Texas Department of Transportation, explained that the Bicentennial ramp and
bridge is an underpass because the bridge “goes over the expressway.”  Leal
further noted that an “overpass would be a bridge on the main lanes [of the
expressway] that goes over a local street.”

 





[2] The Bicentennial
bridge allows for drivers to travel in both directions—northbound and
southbound—via two lanes in either direction.  In addition, the bridge also
includes space for biking and hiking. 





 

[3]
In their appellate brief, the Percheses assert that “numerous, similar, serious
auto crashes at the T-intersection on the top of the ramp” have occurred,
“including 8 fatalities.”  However, in his deposition testimony, Leal recalled
only four automobile accidents “or incidents that resulted in death” occurring
on the underpass.

 





[4] Leal later
described TxDOT’s efforts after the first accident as adding “those
channelization signs that have the dual arrows saying that you must turn left
on [sic] both lanes.”





[5] Leal admitted
that he was aware of a lawsuit brought in regard to the third accident at the
Bicentennial underpass; however, he noted that the lawsuit did not name TxDOT
as a responsible party.





[6] Dannenbaum,
TEDSI, and HDR are not parties to this appeal.





[7] Section
65.021(a) of the civil practice and remedies code provides that “[t]he judge of
a district or county court . . . shall hear and determine applications for
writs of injunction.”  Tex. Civ. Prac.
& Rem. Code Ann. § 65.021(a) (Vernon 2008).  Section 24.007 of the
government code states that a “district court has the jurisdiction provided by
Article V, Section 8, of the Texas Constitution.”  Tex. Gov’t Code Ann. § 24.007 (Vernon 2004).  Article V,
section 8 of the Texas Constitution provides, in relevant part, that: 
“District Court jurisdiction consists of exclusive, appellate, and original
jurisdiction of all actions, proceedings, and remedies, except in cases where
exclusive, appellate, or original jurisdiction may be conferred by this
Constitution or other law on some other court, tribunal, or administrative
body.  District court judges shall have the power to issue writs necessary to
enforce their jurisdiction.”  Tex.
Const. art. V, § 8.

 





[8] Because TxDOT
has not preserved this issue, we do not reach the merits of the permanent
injunction.